IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREGORY LEE GISSENDANER,            )
                                    )
            Plaintiff,              )
                                    )
      v.                            )   CIVIL CASE NO. 1:23-cv-444-ECM
                                    )              [WO]
DICK'S SPORTING GOODS, INC.,        )
                                    )
            Defendant.              )

**MEMORANDUM OPINION and ORDER**

**I. INTRODUCTION**

This case concerns Dick's Sporting Goods, Inc.'s ("DSG") decisions not to transfer Gregory Lee Gissendaner ("Gissendaner"), a former store manager at the DSG store in Dothan, Alabama, to other DSG locations in the southeast and its decision to terminate Gissendaner from his position in Dothan.  Gissendaner argues that DSG declined to transfer him to other stores because of his age and then retaliated against him for raising concerns about age discrimination to DSG's Human Resources Department ("HR").  Gissendaner claims that DSG violated federal law, 29 U.S.C. § 623, the Age Discrimination in Employment Act ("ADEA"), and state law, ALA. CODE § 25-1-20 *et seq.*, the Alabama

Age Discrimination in Employment Act ("AADEA"), by unlawfully discriminating against him because of his age and retaliating against him for engaging in protected activity.[1]

Now pending before the Court is DSG's motion for summary judgment (doc. 46), Gissendaner's motion to strike the affidavit of Employee 1 (doc. 55), and Gissendaner's motion to strike the affidavit of Stanley Mays (doc. 56).[2]  The motions are fully briefed and ripe for review.  After reviewing the parties' submissions, the Court finds as follows: (1) DSG's motion for summary judgment (doc. 46) is due to be GRANTED, and (2) Gissendaner's motions to strike affidavits from DSG (docs. 55, 56) are due to be DENIED.

## II.  JURISDICTION

The Court has subject matter jurisdiction over the federal law claims in this proceeding pursuant to 28 U.S.C. § 1331 and the state law claims pursuant to 28 U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

---

[1] Both the Northern District and Middle District of Alabama have addressed whether Alabama age discrimination claims can be brought in the same case as federal age discrimination claims but reached different results. *Compare Forsyth v. NHC Place/Anniston, LLC*, 2018 WL 4900953 (N.D. Ala. Oct. 10, 2018) *with Wallace v. Jim Walter Homes, Inc.*, 68 F. Supp. 2d 1303 (M.D. Ala. 1999).  The Court need not answer the question because the two claims are analyzed using the same standard, so the Court's analysis and conclusion would be the same for both claims. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1334 n.8 (11th Cir. 2024) (citing *Robinson v. Alabama Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007)).  The Court thus analyzes the two claims together.

[2] Gissendaner styles these motions as "Motions to Strike Affidavits," but the pieces of evidence Gissendaner seeks to strike are declarations and not affidavits because they were not sworn "before an officer authorized to administer oaths." *Affidavit*, Black's Law Dictionary (12th ed. 2024); *see also Declaration*, Black's Law Dictionary (12th ed. 2024) ("A formal, written statement – resembling an affidavit but not notarized or sworn to – that attests, under penalty of perjury, to facts known by the declarant.").  The Court will refer to the contested pieces of evidence by their proper name, declarations, unless explicitly referring to the motion's title.

### III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c).  The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311.  The burden then shifts to the non-moving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*,

475 U.S. at 586. Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

## IV. FACTS[3]

### A. Background

Gissendaner was born in 1980 and worked for DSG from August 2011 to March 2022 in various capacities at different DSG stores. (Doc. 53-9 at 3, 5–7).[4] At some point in 2017 or 2018, Gissendaner became a store manager for the DSG store in Dothan, Alabama, a position he held until his termination in March 2022. (Doc. 47-1 at 4–5).

---

[3] Because this case comes before the Court on DSG's motion for summary judgment, the Court construes the facts in the light most favorable to Gissendaner, the nonmovant. The Court draws all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

DSG is a sporting goods retailer that operates stores across the United States, including a district referred to as the "Gulf Coast," which encompasses Dothan. (Doc. 47-5 at 1, para. 3). From 2019 until his termination in 2022, Gissendaner reported to Brent Jordan ("Jordan"), the district manager overseeing the Gulf Coast District. (Doc. 53-9 at 7). Jordan was born in 1981 and is one year younger than Gissendaner. (Doc. 47-7 at 1, para. 1).

During his employment, Gissendaner was subject to certain company policies that DSG has for all its salaried employees. (*See* docs. 47-1 at 6, 53-1 at 6). Most of these policies can be found in DSG's Salaried Teammate Handbook and DSG's Code of Ethics and Business Conduct. (Doc. 47-7 at 1–2, para. 3). The Code of Ethics and Business Conduct emphasizes DSG's "zero tolerance for acts of racism or any kind of discrimination, hatred, or harassment." (Doc. 53-9 at 9).

As a store manager, Gissendaner posted financial figures in his store that matched or exceeded the goals and expectations set by DSG. (Doc. 47-7 at 15). Routinely, he received high marks on his scorecard[5] that measured the store's financial performance and often paced the Gulf Coast District in earnings for a store of Dothan's size. His performance reviews matched these metrics. (*See* doc. 47-7 at 14–24). District Manager Jordan gave Gissendaner high marks regarding the performance of the store and its profits. (*See id.*).

---

[5] The scorecard is a metric that DSG uses to evaluate the performance of its stores and managers. It is designed to be "a tool for [DSG] to gather data to suggest how stores are performing, and how store managers or districts are performing as well." (Doc. 47-13 at 8).

But the profits and numbers do not tell the complete story of Gissendaner's tenure as a store manager at DSG. On different occasions while a store manager, fellow DSG employees noted that Gissendaner made unprofessional comments that caused other employees to feel, at the very least, uneasy. (*See* docs. 47-7 at 22, 47-6 at 2, para. 9). The record presented by the parties focuses on three separate occurrences.

## B.    Instances of Misconduct

### 1.    Topgolf

As part of a DSG store managers retreat in 2019, store managers from across DSG gathered in Orlando, Florida. (Doc. 47-3 at 14). One of the events included in the retreat was a group outing to Topgolf. (*Id.*). At Topgolf, the group hit golf balls, consumed alcohol, and joked with each other. (*Id.*). During the evening, Gissendaner made a wager with one of his coworkers. (*Id.*). Gissendaner bet $200 that he could hit a ball further than a fellow manager. (*Id.*). Stanley Mays ("Mays"), another store manager, who is black, offered to hold Gissendaner's money while he took his turn. (*Id.*). Gissendaner hesitated. (*Id.*). At this point, Mays asked if Gissendaner thought he would steal the money, to which Gissendaner responded to the effect of, "Well, you are Black." (*Id.*). In his deposition, Gissendaner testified that he does "not believe [he] made [the] racially insensitive comment [attributed to him] at the [Topgolf] event." (Doc. 53-9 at 12:17–19). But, in a 2020 phone call with Tom Johnson ("Johnson"), the Regional Director of HR, Gissendaner stated, "I believe people heard what they say they heard. I don't []ever doubt a man on that. What I'm telling you is I don't recall saying anything. . . . If I've done anything to anyone, I'm sure it was jovial in nature . . . ." (Doc. 47-10 at 35–36).

Several DSG managers heard Gissendaner make this comment and immediately began to leave the area where Gissendaner had made the comment. (Doc. 47-3 at 14). Jordan, who had been in the bathroom at the time the comment was made, returned to the area and asked why everyone was leaving. (Doc. 47-7 at 2, para. 5). Reluctantly, one employee informed Jordan what Gissendaner had said. (*Id.*). Jordan spoke with Mays about the incident, and Mays stated that he did not want to pursue any kind of formal complaint or risk Gissendaner's job as a store manager. (*Id.* at 3, paras. 6–7). At Mays' request, no formal investigation was taken at that time. (*Id.* para. 7). But the damage had been done.

Jordan's performance review of Gissendaner in 2019 reflected the discrepancy between Gissendaner's financial performance and interpersonal skills, specifically his inclusion scores. (Doc. 47-7 at 20, 22). At this point, Gissendaner stated in his deposition that Jordan began to refer to him as a "dinosaur" who needed to evolve if he did not want to go extinct. (*See* docs. 47-1 at 10, 53-9 at 15). Jordan told Gissendaner that "[DSG] [was] a progressive company, and [Gissendaner] need[ed] to get with the ways of the world." (Doc. 47-1 at 10). Jordan apparently made the dinosaur comments to Gissendaner "several" times, but Gissendaner could not recall "the exact number." (*Id.* at 11). Gissendaner claims that Jordan also began calling him a racist in front of his employees, and Gissendaner complained to Johnson about this treatment by phone in 2020. (*See* docs. 47-1 at 14, 47-10 at 3). During this 2020 call, Gissendaner requested an investigation into the Topgolf incident but did not mention that Jordan used the term "dinosaur" towards Gissendaner. (*See* docs. 47-1 at 9, 47-10 at 11–13).

## 2.    Gissendaner and Employee 1[6]

From 2017 until Gissendaner's termination in 2022, Gissendaner had a relationship with one of the hourly employees under his supervision, Employee 1, which the employee described as resembling one of an "abusive father."[7] (Doc. 47-6 at 1, paras. 2, 5). Gissendaner assigned Employee 1 extra work that was typically not given to hourly employees under the guise that he trusted Employee 1 more than other staff members. (*Id.* at 2, paras. 6–7). This treatment caused Employee 1 to carry a heavier workload than the rest of his coworkers. (*Id.*). Gissendaner also referred to Employee 1 by a nickname in reference to his genitalia, "footlong." (*Id.* at 3, para. 10). The nickname began after Employee 1 privately shared a story with Gissendaner. (*Id.*). Gissendaner consistently referred to Employee 1 by this nickname in front of others despite Employee 1's request for Gissendaner to stop. (*Id.*).

The relationship spiraled to the point that Employee 1 no longer felt he could go to work without extreme stress and anxiety. (*Id.* at 5, para. 19). Employee 1 took time off work and received medical leave to seek mental health treatment. (*Id.* at 6, para. 24). While on leave, Gissendaner continued to text and call Employee 1 despite Employee 1's requests for Gissendaner to stop contacting him. (*Id.* at 6–7, para. 25). Employee 1's experience

---

[6] Because the events described in his declaration caused Employee 1 significant mental anguish, DSG used the pseudonym "Employee 1" to protect his privacy as his identity had no material relevance to the case. Even though Gissendaner did not follow suit in his briefing, the Court will use the naming convention proposed by DSG.

[7] Gissendaner disputes the nature of his relationship with Employee 1 as portrayed by Employee 1 in his declaration and to DSG management. Gissendaner deposed Employee 1 prior to the commencement of discovery. At the deposition, Employee 1 was unrepresented by counsel and stated that all problems he "had with [Gissendaner] stemmed from the problems that [Gissendaner] was facing" with DSG management. (Doc. 53-12 at 4).

with Gissendaner as a manager led to Employee 1 sending an email outlining Gissendaner's behavior to Jordan on January 31, 2022. (*Id.* at 11–14). Jordan immediately notified HR of Employee 1's concerns on January 31, 2022, (doc. 47-7 at 6, para. 19), and HR investigated the complaint (doc. 47-3 at 11). On February 2, 2022, Employee 1 memorialized his complaints in a Memorandum of Concern, which was forwarded to HR. (Doc. 47-6 at 11, 16–18). Upon HR's request, Employee 1 provided "additional information and clarity" on February 15, 2022, to assist in the investigation regarding his complaint about Gissendaner. (*Id.* at 7, para. 26).

### 3. Popeye's Chicken

On February 14, 2022, Stephen Watford ("Watford"), a manager from another DSG store in the Gulf Coast District, contacted Jordan about a recent event in which Gissendaner made another racially insensitive comment. (Doc. 47-3 at 16, 47-7 at 29–30). During the conversation, Gissendaner lamented not being interviewed for a store manager position in Lake Charles, Louisiana, and articulated that the Topgolf incident from 2019 continued to "haunt" him. (Doc. 47-7 at 29–30). Then, Gissendaner stated that "he could not be racist" because "he was ordering a chicken sandwich from Popeye's." (*Id.* at 29). Ja'quaria Johnson, who is a black female, was present with Gissendaner and Watford during this conversation and heard Gissendaner make the statement. (Doc. 53-6 at 2, para. 7). She stated the remark was more accurately described as about "eating Popeye's for lunch with [her]," and she was not offended by the comment. (*Id.* para. 8). Ja'quaria Johnson never spoke with anyone else at DSG about Gissendaner's comment. But Watford shared it with Jordan. (Docs. 47-3 at 16, 47-7 at 29–30).

## C.    Gissendaner's Requested Transfer to Panama City

In the fall of 2021, before HR knew about Employee 1 and before Gissendaner made the comment about Popeye's chicken, Gissendaner applied for the store manager position in Panama City Beach, Florida. (Doc. 47-1 at 12–13).   In conversations with Jordan, Gissendaner expressed a desire to advance within DSG to higher roles, including district manager. (Doc. 47-11 at 4).   Based on these conversations, Gissendaner believed he needed to manage a "higher profile" or "higher volume" store to gain exposure and be eligible for further promotion within DSG.[8] (*Id.*).   Panama City is such a store with higher volume, more employees, and additional features (like a premium footwear deck) compared to the DSG store in Dothan. (Doc. 47-11 at 11).   Gissendaner interviewed with Jordan and Chip Jones, the District Loss Prevention Manager for DSG, who is four years older than Gissendaner (doc. 47-5 at 2, para. 5). (*See* doc. 47-11).   After his interview with Jordan and Chip Jones, Gissendaner had a second interview with Regional Vice President Josh Brown, who is three years older than Gissendaner (doc. 47-5 at 2, para. 7); Regional Director of Loss Prevention Michael Jackson, who is seventeen years older than Gissendaner (*id.* para. 8); and Johnson, who is twenty-four years older than Gissendaner (*id.* para. 6). (Doc. 47-1 at 13–14).   Only one other candidate was interviewed, Nicholas Allen ("Allen"), who was the store manager in Lake Charles, Louisiana, and is two years

---

[8] During a conversation with Lisa Mosby, a DSG HR manager, after Gissendaner did not receive the job, Mosby told Gissendaner, "I think we need to start viewing moves within stores as promotions based on them being higher volume.  So if you're in a low volume store today and you move to a medium volume store because you're doing well, and we believe you're ready to take on a bigger scope of work, to me, that's a promotion.  And I would imagine any store manager would need to have exposure at various complexities, various volumes, various communities, etc., before they would be ready to be multi-unit." (Doc. 47-13 at 7).

younger than Gissendaner (doc. 47-5 at 2, para. 4). (Doc. 47-1 at 14).  In DSG's internal talent rating system near the time of the interviews, Gissendaner performed at a rate of "Exceeds Expectations" and was identified as a "Core/Key Talent" who was a high performer and well placed in his current role. (Doc. 53-22 at 7).  Allen, on the other hand, performed at a rate of "Meets Expectations" and was identified as a "Top Talent" who was a high performer and had high potential. (*Id.*).

During his first interview, Gissendaner expressed his desire to leverage the position at Panama City into a bigger role within DSG:

> [A]s far as my interest [in Panama City,] it goes back to the conversation [Jordan] and I had.  I want to do more with the company, you know.  I've expressed interest.  I eventually want to be a district manager.  And, you know, [Jordan] stated, you just don't get the notoriety, regardless of what your results are, that are needed to run a bigger volume store.  And after reading [the email] [Jordan] sent out last Monday basically stating how, you know, that [Panama City] is a . . . flagship store.  So what better way to get notoriety, if indeed I need to run a larger volume store to further my career with the company.  Because, you know, like I said, I want to do more with the company.  So that's where it all arises from.

(Doc. 47-11 at 4–5).  Neither Jordan nor Chip Jones reacted to Gissendaner's comments to suggest that he had a mistaken interpretation of how to advance within DSG. (*See id.*).

After interviews with both candidates, the selection team, which comprised the interviewers, decided to select Allen for the position.  The selection team made this decision "[b]ased on the interview results." (Doc. 47-3 at 10).  The team also believed Allen (1) had a better understanding of the specific market; (2) provided details "about pluses and deltas for the holiday that proceeded"; (3) "had more experience with higher

volume stores"; and (4) possessed a "much greater desire . . . to be in [the Panama City] market." (*Id.* at 10–11). Jordan informed Gissendaner of the selection team's decision to hire Allen on December 6, 2021. (Doc. 47-7 at 5, para. 15).

## D.    Gissendaner's Response to not Receiving the Panama City Position and HR's Reply

A week after finding out he did not receive the position in Panama City, Gissendaner reached out to HR manager, Lisa Mosby ("Mosby"), to express some concerns. Gissendaner claimed he wanted to "file a formal complaint for discrimination, harassment, unfair labor practices, and creating a hostile work environment." (Doc. 53-5 at 2). Gissendaner requested "a formal investigation." (*Id.*). Gissendaner did not mention age in this email. (*See id.*). Three days later, on December 16, 2021, Mosby and Gissendaner spoke on the phone about his email and allegations of mistreatment. (Doc. 53-14 at 1). Gissendaner alleged that Jordan mistreated him by stating "I don't get paid to deal with racists"; calling the DSG store in Dothan "historically racist"; treating Gissendaner differently after the Topgolf incident, which was not properly investigated in Gissendaner's eyes; and making jokes at Gissendaner's expense. (Doc. 47-13 at 13–14, 24–25). Gissendaner did not mention Jordan calling him a "dinosaur" in this call with Mosby but mentioned his age twice as part of a list of complaints. (*Id.* at 10, 23). During the conversation, Gissendaner relayed his concerns about the Topgolf incident of 2019 and how he felt that incident affected his relationship with Jordan. (*Id.* at 10–12). Gissendaner repeated his concerns that there was never an investigation after the Topgolf event multiple

times. (*Id.* at 11, 16, 18, 19, 20, 21, 34). Mosby informed Gissendaner that she "ha[d] some things to do on [her] end to . . . understand" the whole situation. (*Id.* at 28).

After her conversation with Gissendaner, Mosby opened an investigation into the Topgolf event that occurred in 2019. As part of the investigation, Mosby directed Johnson to meet with individuals who were at the event, and they received at least three statements from witnesses to the situation who stated that Gissendaner made the statement alleged. (*See* doc. 53-2 at 6). Mosby told Gissendaner "that if [she] was the HR partner at that time in 2019, [she] would have . . . terminated his employment immediately for that event." (Doc. 47-2 at 6). Before Mosby finished her investigation, Gissendaner applied to become the store manager at the DSG store in Lake Charles, Louisiana, but was not allowed to interview.[9] (*See* docs. 47-1 at 27–28, 47-3 at 13). By the conclusion of the investigation, Mosby determined and informed Gissendaner on January 6, 2022, that he would not be considered for any different roles within DSG, including the open position at Lake Charles. (*See* docs. 47-1 at 29, 47-2 at 8). Based on her review, Mosby believed that Gissendaner "lacked the leadership behavior and capability that [DSG] believe[s] [is] required [to be] a successful leader at Dick's Sporting Goods based on the highly inappropriate and racially charged language that was used at the Topgolf event." (*Id.* at 10). She recommended that Gissendaner work with Jordan to create an individual development plan ("IDP") and begin reworking his personal brand within the company. (Doc. 47-14 at 4, 8).

---

[9] DSG selected Zachary Stone ("Stone") as store manager in Lake Charles. (Doc. 53-22 at 5). Stone was 29 years old. (*Id.*). DSG's "talent" data shows that Stone was rated as "Meets Expectations" and identified as a "Top Talent" with "High Potential." (*Id.* at 6). For his role as store manager in Lake Charles, Stone received a salary "significantly lower" than Gissendaner's salary in Dothan. (Doc. 47-5 at 2, para. 13). Stone had never "been investigated for or accused of making racially insensitive comments." (*Id.*).

Mosby memorialized her phone conversation with Gissendaner via email on January 7, 2022, reaffirming her suggestion that Gissendaner work with Jordan to form an IDP and that DSG investigated his concerns. (Doc. 47-1 at 29).  Gissendaner responded on January 12, 2022. (*Id.* at 26).  In this email, he criticized the way Mosby conducted her investigation, reiterated his concerns that Jordan viewed him as a racist, gave examples of Jordan using unprofessional language (unrelated to Gissendaner's age), claimed he was discriminated against because of his age, and alleged he was retaliated against for asking DSG to investigate the Topgolf incident. (*See id.* at 26–28).  Relevantly, Gissendaner stated, "I have been called a racist.  I have been discriminated against because of my age.  Further, I have been personally attacked because of where I live, how I talk, my body shape, and because I am Southern. . . . Further, retaliation is illegal.  I am being held to a different standard because of my discrimination complaint and my complaint of unfair company practices." (*Id.* at 26–27).  Mosby responded to Gissendaner's concerns on January 26, 2022, and reiterated her belief that DSG went "above and beyond to investigate and address the issues outlined in [Gissendaner's] email." (*Id.* at 25).  According to the record, the January 26, 2022 email was the last communication between HR and Gissendaner.

**E.    Conclusion of Mosby's Investigation and DSG's Decision to Terminate**

After Mosby completed her investigation in January 2022, she received additional information regarding Gissendaner's relationship with Employee 1, described above, in early February. (Doc. 47-3 at 15).  In the middle of February, DSG determined that it would terminate Gissendaner based on a "pattern" of unprofessional behavior. (Doc. 47-2 at 25–26).  After DSG initiated termination proceedings for Gissendaner, HR received notice

from Watford concerning Gissendaner's comments about Popeye's. (Doc. 53-2 at 26). Mosby described this incident as "the nail in the coffin." (*Id.*). Around this time, Gissendaner reached out to Jordan to inquire about applying for the store manager position in Mobile, Alabama, but he never formally applied for the position. (Doc. 47-7 at 26).[10]

With Mosby's support, the Regional Leadership team, which included Josh Brown and Johnson, suggested ending Gissendaner's employment based on this pattern of behavior to the Vice President of Human Resources, Michael Keinath ("Keinath"). (Doc. 47-3 at 6). Mosby and Johnson submitted a situation recap[11] to Keinath (*id.*), who is three years older than Gissendaner (doc. 47-5 at 2, para. 9). The situation recap recommended that DSG terminate Gissendaner, which Keinath accepted after reviewing the evidence. (Doc. 47-3 at 6). On March 7, 2022, DSG ended Gissendaner's employment with the company. (*Id.*). Jordan announced DSG's decision to terminate Gissendaner from his role with DSG to the Dothan store, citing Gissendaner's racially insensitive comments as the basis for the termination. (Doc. 53-6 at 3).

## F.   Procedural History

Gissendaner filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that DSG "treated [him] differently than . . .

---

[10] DSG selected Courtney Gibbs ("Gibbs") as store manager in Mobile. (Doc. 53-22 at 5). Gibbs was 29 years old. (*Id.*). DSG's "talent" data shows Gibbs had a current performance rating of "Meets Expectations" and was identified as a "Top Talent" with "High Potential." (*Id.* at 6). As store manager in Mobile, Gibbs received a salary "significantly lower" than Gissendaner's salary in Dothan. (Doc. 47-5 at 2, para. 13). Gibbs also had never "been investigated for or accused of making racially insensitive comments." (*Id.*).

[11] The situation recap included three past events, two from 2013 and one from 2016, when Gissendaner exhibited unprofessional behavior. (Doc. 47-3 at 16). It also "noted that Gissendaner has lodged claims of discrimination (all unfounded) and indicated he is working with an attorney." (*Id.* at 14).

its younger, less qualified employees." (Doc. 13 at 13).  The EEOC issued Gissendaner a notice of right to sue on August 11, 2023, (*id.* at 14), but Gissendaner had already filed this suit in state court on July 21, 2023, which DSG removed to this Court on July 25, 2023 (*see* doc. 1).

Before discovery in this case commenced, Gissendaner conducted a deposition of Employee 1 on August 21, 2023.  At the deposition, Employee 1 was unrepresented by counsel. (Doc. 47-6 at 7–8, para. 30).  In a later declaration, Employee 1 recounted that his experience in this deposition was traumatic, and he felt attacked by Gissendaner and his counsel. (*Id.* at 8, para. 31).  Now, Gissendaner seeks to strike Employee 1's declaration because he claims it was unsigned and thus unverified. (*See* doc. 55 at 1).  DSG's counsel communicated its intention to use the "Employee 1" pseudonym to Gissendaner's counsel and encouraged Gissendaner to use this moniker in lieu of Employee 1's actual name prior to filing its motion for summary judgment. (Doc. 62 at 1).  Upon seeing the filing of the motion to strike, DSG's counsel provided Gissendaner an unredacted version of Employee 1's declaration and encouraged counsel to withdraw the motion, but Gissendaner refused. (*Id.* at 2).  DSG requests reasonable attorneys' fees under 28 U.S.C. § 1927 for the cost it incurred responding to the motion because it claims the motion was frivolous and that Gissendaner's counsel exhibited bad faith. (Doc. 62 at 6–7).  DSG claims that the motion is procedurally improper and that counsel knew it was an improper motion unsupported by law or fact at the time of filing. (*Id.* at 7).

After filing the first motion to strike, Gissendaner filed a motion to strike Stanley Mays' affidavit on the grounds that Mays' statement was not before the decisionmakers

when DSG decided not to hire Gissendaner for the Panama City location or terminate him. (*See generally* doc. 56). Tellingly, Gissendaner cites no case law in the motion to support this proposition that a declaration is inadmissible just because it was not before the decisionmaker at the time of the decision. (*See id.*). DSG opposed Gissendaner's motion and argued that a motion to strike is procedurally improper. (Doc. 61).

## V.  DISCUSSION

Pending before the Court are Gissendaner's motions to strike (docs. 55, 56) and DSG's motion for summary judgment on all four of Gissendaner's claims:  (1) age discrimination in violation of the ADEA, (2) retaliation in violation of the ADEA, (3) age discrimination in violation of the AADEA, and (4) retaliation in violation of the AADEA (doc. 46). The Court addresses the motions to strike, Gissendaner's ADEA claim for the four alleged adverse actions, and Gissendaner's retaliation claim in turn.[12]

### A.    Motions to Strike

After Gissendaner filed his opposition brief, he filed two motions to strike declarations submitted by DSG in support of its motion for summary judgment:  Employee 1's declaration and Stanley Mays' declaration.  Under Federal Rule of Civil Procedure 12(f), a court may strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." *See* FED. R. CIV. P. 12(f). "While courts may, at times, strike material outside of the pleadings, . . . courts have held that motions to strike are not appropriate as

---

[12] As previously noted, the Court analyzes Gissendaner's state and federal age discrimination and state and federal retaliation claims together because the standard applied by both federal and state courts is the same. *See McCreight*, 117 F.4th at 1334 n.8 (analyzing ADEA and AADEA discrimination claims); *Johnson v. La Petite Acad.*, 2020 WL 2840090, at *10 (N.D. Ala. June 1, 2020) (citing *King v. CVS Caremark Corp.*, 2 F. Supp. 3d 1252, 1258, 1264 (N.D. Ala. 2014)) (analyzing ADEA and AADEA retaliation claims).

to [a declaration] submitted in connection with a motion for summary judgment." *ECB USA, Inc. v. Chubb Ins. Co.*, 2021 WL 9219451, at *1 (S.D. Fla. Dec. 3, 2021) (citations omitted).[13]   The Court agrees that a motion to strike is not the appropriate mechanism to exclude the evidence, *see, e.g., Polite v. Dougherty Cnty. Sch. Sys.*, 314 F. App'x 180, 184 n.7 (11th Cir. 2008), but the Court still addresses Gissendaner's arguments.

### 1.    Declaration of Employee 1

Gissendaner moves to strike Employee 1's declaration because it claims that it is unsigned, contradicts previous testimony given by Employee 1, and was not before a decisionmaker.  Gissendaner's arguments fail for three reasons.

First, DSG represents that the declaration is not unsigned but is simply redacted and provided Gissendaner's counsel with an unredacted version that showed Employee 1's signature. (Doc. 62 at 3).  Gissendaner made no effort to dispute DSG's representation. Additionally, DSG later filed an unredacted version of the declaration bearing Employee 1's name and signature. (*See* doc. 62-1).  The argument that the declaration is unverified is, therefore, meritless.

Second, Gissendaner argues that Employee 1's declaration is inadmissible because it contradicts Employee 1's earlier deposition testimony. (Doc. 55 at 2).  True, a witness cannot, without explanation, offer clear testimony in a deposition and then offer a conflicting declaration to create a material dispute of material fact. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  However, while

---

[13] Here, and elsewhere in this Memorandum Opinion, the Court cites nonbinding authority.  While the Court recognizes that these cases are nonprecedential, the Court finds them persuasive.

Gissendaner conclusorily argues that Employee 1's declaration is conflicting, Gissendaner fails to specifically identify any inconsistencies between Employee 1's declaration and his deposition testimony.  This Court is not required to sift through the record in search of evidence to support Gissendaner's position, and the Court declines to do so here. *Cf. Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Consequently, this argument does not supply a basis for the Court to disregard Employee 1's declaration.

Third, the information detailed in the declaration was before DSG decisionmakers at the time DSG elected to terminate Gissendaner.  Thus, the declaration is relevant in evaluating Gissendaner's claim about his termination, which occurred after Employee 1 alerted district leadership and HR to his experience working with Gissendaner. (*See* doc. 53-2 at 26–27).  Gissendaner's arguments are without merit, and his motion to strike Employee 1's affidavit is due to be denied.[14]

---

[14] Pursuant to 28 U.S.C. § 1927, DSG requests reasonable attorney's fees in responding to this motion. Section 1927 authorizes the Court to order an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" to pay the "excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  To impose sanctions pursuant to § 1927, "an attorney must engage in unreasonable and vexatious conduct; this conduct must multiply the proceedings; and the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct." *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (citation omitted).  "An attorney multiplies the proceedings unreasonably and vexatiously 'only when the attorney's conduct is so egregious that it is "tantamount to bad faith."'" *Id.* (citation omitted).  While the Court finds Gissendaner's motion to be without merit, its filing does not

### 2.    Declaration of Stanley Mays

The Court has not relied on Stanley Mays' declaration in considering DSG's motion for summary judgment, and the declaration, if considered, would not change the Court's conclusion.    Thus, Gissendaner's motion to strike Stanley Mays' affidavit is due to be denied as moot. *See, e.g.*, *Allen v. PJ Cheese, Inc.*, 2024 WL 2884170, at *26 (N.D. Ala. June 7, 2024).

## B.    ADEA Claim[15]

The ADEA prohibits an employer from "fail[ing] or refus[ing] to hire or discharg[ing] an individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish a claim under the ADEA, 'a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision.'" *McCreight v. AuburnBank*, 117 F.4th 1322, 1334 (11th Cir. 2024) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). Plaintiffs may show age discrimination through either direct or circumstantial evidence. *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010).    Here, Gissendaner offers circumstantial evidence to support the notion that DSG denied him transfers to other stores and terminated him because of his age. (*See* doc. 54 at 29) ("Gissendaner's case rests on circumstantial evidence.").[16]  When relying on circumstantial

---

amount to conduct "so egregious that it is 'tantamount to bad faith.'" *See id.*  The Court thus declines to award DSG attorney's fees.

[15] As previously noted, Gissendaner brought claims under both the Federal and Alabama versions of laws prohibiting the discrimination of individuals based on age.  Because the standards used are the same, the Court focuses its analysis on Gissendaner's claims under the Federal ADEA.

[16] Gissendaner characterizes his evidence as circumstantial, and the Court independently finds that he does not offer direct evidence of discrimination.  The only possible statements Gissendaner could point to are Jordan's "dinosaur" comments, which the Court does not find qualify as "the most blatant remarks, whose

evidence, a plaintiff may prove discrimination with either the *McDonnell Douglas* burden-shifting framework or "with circumstantial evidence so long as the evidence raises a reasonable inference of [discriminatory] intent." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310 (11th Cir. 2023) (citing *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023)).  While this second test is referred to as the "convincing-mosaic framework," "it is a metaphor, not a legal test and not a framework." *Id.* at 1311 (citation omitted).  "As [the Eleventh Circuit] ha[s] explained, the *McDonnell Douglas* framework and the convincing mosaic approach are two paths to the same destination—the ordinary summary judgment standard." *McCreight*, 117 F.4th at 1335 (citing *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 943–47 (11th Cir. 2023)).

In ADEA discrimination cases, the familiar three-part *McDonnell Douglas* framework applies. *See id.* at 1334–35.  First, the plaintiff must establish a prima facie case of discrimination. *Id.*  The prima facie case creates a presumption of unlawful discrimination. *See Liebman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). "To make a prima facie case of age discrimination, the employee must show:  (1) he was a member of the protected group [over the age of forty]; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position [to which he applied or] from which he was discharged; and (4) he was qualified

---

intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Jefferson*, 891 F.3d at 922–23 (citation and quotation omitted) (holding that a higher-ranked employee's statement that "he wanted a Korean in that position" was direct evidence of discrimination and that the district court erred when it did not consider this evidence and analyzed the plaintiff's claims under circumstantial evidence framework).  As the First Circuit has noted, the term "dinosaur" can have a variety of meanings including "impractically large, out-of-date, or obsolete." *Torrech-Hernandez v. Gen. Elec. Co.*, 419 F.3d 41, 55 (1st Cir. 2008).

to do the job [for which he applied or] from which he was discharged." *Id.* (citing *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012)); *see also* 29 U.S.C. § 631 (defining the protected class as "individuals who are at least [forty] years of age").[17]  Second, if the plaintiff establishes a prima facie case, "the burden of production shifts to the [defendant] to articulate a legitimate, non-discriminatory reason for its decision." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1191 (11th Cir. 2024) (citing *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1216 (11th Cir. 2021)).  "This burden is 'exceedingly light'; the defendant must merely proffer non-[discriminatory] reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation omitted).  Third, "the burden then shifts back to the [plaintiff] to present sufficient evidence creating a genuine issue of material fact that the [defendant]'s reason is pretext for discrimination." *Akridge*, 93 F.4th at 1191 (citing *Todd*, 998 F.3d at 1216).

If a plaintiff cannot present sufficient evidence to survive under the *McDonnell Douglas* framework, the plaintiff "will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to

---

[17] As the Eleventh Circuit has stated, "a comparator analysis must be conducted at the prima facie stage of the *McDonnell Douglas* framework—and not relegated to the pretext phase." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc).  But the Eleventh Circuit has not directly addressed whether a plaintiff bringing a claim under the ADEA must produce comparator evidence at the prima facie stage. *See McCreight*, 117 F.4th at 1338–39 (analyzing comparator evidence as part of its convincing mosaic analysis for the ADEA claim).  When confronted with the issue, Eleventh Circuit panels have split over whether ADEA plaintiffs must show comparator evidence to establish a prima facie case. *Compare Reed v. Forney Industries, Inc.*, 800 F. App'x 782, 785 (11th Cir. 2020) (not requiring a comparator analysis at the prima facie stage) *with Dowdell-McElhaney v. Global Payments Inc.*, 2024 WL 2796976, at *6 (11th Cir. May 31, 2024) (requiring a comparator analysis at the prima facie stage); *see also McCreight*, 117 F.4th at 1334–37 (affirming district court's denial of age discrimination claim when the district court did not conduct a comparator analysis for plaintiff's ADEA claim).  Neither party argues that a comparator analysis applies and relies on the test announced in *Liebman*.  Because Gissendaner's claims fail under either framework, the Court applies the prima facie test as announced in *Liebman*.

infer intentional discrimination.'" *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (alteration in original) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)) ("*Lewis II*").  Under either the *McDonnell Douglas* framework or a convincing mosaic theory, Gissendaner's claim of age discrimination fails.

### 1.  *McDonnell Douglas*

Gissendaner claims that DSG discriminated against him on four separate occasions: (1) DSG's selection of Allen to be store manager in Panama City; (2) DSG's selection of Zachary Stone to be store manager in Lake Charles; (3) DSG's selection of Courtney Gibbs to be store manager in Mobile; and (4) DSG's decision to terminate Gissendaner.  The Court analyzes each of Gissendaner's alleged adverse employment actions under the *McDonnell Douglas* framework before analyzing all of Gissendaner's evidence as part of a convincing mosaic.

### a.  Panama City

For Gissendaner's first alleged discriminatory action, DSG's decision to hire Allen instead of Gissendaner in Panama City, the Court finds that Gissendaner does not establish his prima facie case of age discrimination.  Even if he had shown a prima facie case, the Court finds that DSG presents legitimate, nondiscriminatory reasons for not transferring Gissendaner to Panama City, which Gissendaner fails to rebut.

i.       **Prima Facie Case**

To the extent that Gissendaner maintained his claim that the denial of his application was discriminatory,[18] the Court finds Gissendaner fails to establish a prima facie case of age discrimination.

Based on the evidence presented in the record, Gissendaner can show the first two elements of a prima facie case:  he was a member of the protected class and was subject to an adverse employment action.  DSG argues that Gissendaner's transfers between stores would not qualify as an "adverse employment action" because DSG "considers such moves lateral transfers" and internally codes them as such. (*See* doc. 47 at 19).  It is true that the Eleventh Circuit has held "[a] lateral transfer that does not result in lesser pay, responsibilities, or prestige is not adverse.  Likewise, the refusal to give an employee such a transfer cannot be an adverse employment action." *Barnhart v. Wal-Mart Stores, Inc.*,

---

[18] In his complaint, Gissendaner alleged that DSG's decision not to hire him in Panama City was based on his age and discriminatory. (*See* doc. 13 at 2, para. 13).  But in his opposition to DSG's motion for summary judgment, Gissendaner retreats from this claim.  In the argument section of his brief, Gissendaner references DSG's arguments for summary judgment about the three alleged promotions, Panama City, Lake Charles, and Mobile, but proceeds to make arguments only concerning two stores. (*See* doc. 54 at 31, 34, 37, 38). Specifically, Gissendaner argues that he can establish "a prima facie case of discrimination in connection with the denials of promotion at *two* large volume DSG stores." (*Id.* at 34) (emphasis added).  Gissendaner supports this claim by writing that "DSG's denial of [Gissendaner's application] was clearly illegitimate and discriminatory" "as to [the] Lake Charles and Mobile stores." (*Id.*).  The Court notes that Gissendaner makes passing references to the Panama City store in the argument section and cites two Eleventh Circuit cases for the proposition that an age difference of three years is sufficient to show the "substantially younger" requirement of a prima facie case. (*Id.* at 30) (citing *Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 209 n.3 (11th Cir. 2008); *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988)).  But, outside of passing references, the argument is not fully raised.  When an argument is not raised in opposition to a defendant's motion for summary judgment, "the argument is deemed abandoned," and a district court need not consider it on a motion for summary judgment. *See Penmont, LLC v. Blue Ridge Piedmont, LLC*, 607 F. Supp. 2d 1266, 1269–70 (M.D. Ala. 2009) (citing *Brassler, U.S.A. I v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)).  Nevertheless, the Court addresses the argument.

206 F. App'x 890, 893 (11th Cir. 2006). But "the denial of a transfer *may* be the objective equivalent of the denial of a promotion, and thus qualify as an adverse employment action, even if the new position would not have entailed an increase in pay or other tangible benefits" if the new position "was objectively better." *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023) (emphasis original).

"In short, when an employee alleges that [he] was denied a different job within the same organization, [he] must establish that a reasonable person faced with a choice between the positions would prefer being transferred to the new position. [He] may do so with evidence of improved wages, benefits, or rank, as well as other serious and material changes in the terms, conditions, and privileges of employment, such as the prestige of the position." *Jefferson*, 891 F.3d at 921. In *Jefferson*, the Eleventh Circuit held the denial of a transfer could qualify as an adverse employment action. *Id.* There, the plaintiff presented evidence that the new position "entailed greater skill and provided more specialized experience, on-the-job education, [ ] greater potential for career advancement, . . . different responsibilities, and [different qualifications than her] old job." *Id.* Together, these facts showed the new job "carried additional prestige," and the plaintiff carried her burden to establish that "a reasonable person . . . would prefer being transferred [to the new] position." *Id.* (second alteration in original) (citation omitted).

There is sufficient evidence in the record to show the denial of Gissendaner's application for store manager in Panama City was an adverse employment action to support his prima facie case when the facts are read in the light most favorable to him. Like the

plaintiff in *Jefferson*, Gissendaner produced enough evidence to show that a transfer to Panama City would "carry additional prestige" and be a preferrable position. *See Jefferson*, 891 F.3d at 921.

First, Gissendaner repeats throughout the record that Jordan informed him that he needed to operate a higher volume store to have a chance at promotion to district management. Gissendaner cited these conversations as the reason behind his desire to move to Panama City during his first interview for the store manager position.

Second, Mosby affirmed Gissendaner's interpretation that a move to a higher volume store should be considered "a promotion." She said,

> So if you're in a low volume store today and you move to a medium volume store because you're doing well, and we believe you're ready to take on a bigger scope of work, to me, that's a promotion. And I would imagine any store manager would need to have exposure at various complexities, various volumes, various communities, etc., before they would be ready to be multi-unit.

(Doc. 47-13 at 7).

Third, the record demonstrates that the Panama City store is a bigger, more complex store than Dothan with more employees and additional features, like a premium footwear display. Indeed, one of DSG's reasons for hiring Allen over Gissendaner was his experience in more complex stores.

Finally, DSG does not argue that the manager position in Panama City would pay Gissendaner less than his role in Dothan. (Doc. 47 at 19). While the respective salary amounts are not dispositive, the lack of evidence that the Panama City manager would

receive a lower salary bolsters the Court's conclusion that Gissendaner has adequately shown an adverse employment action.

Viewing the facts and drawing all inferences in Gissendaner's favor, the evidence suggests that a transfer to the Panama City store would have amounted to a promotion in everything but name. If given the store manager position in Panama City, Gissendaner would be in a better position to be promoted to district leadership and have additional responsibilities in a more complex store compared to his current role. This record suggests that Gissendaner's transfer would have the same effect as the plaintiff's requested transfer in *Jefferson*, as his transfer would have resulted in more responsibilities, more prestige, and an opportunity for further promotion.

Even though Gissendaner presents enough evidence for the first two prongs of his prima facie case, he fails to meet the third prong–that the candidate DSG selected is "substantially younger" than Gissendaner. The Eleventh Circuit has held that as little as a three-year age gap can support a finding that a defendant selected a "substantially younger" candidate when there are other indications of discrimination. *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (affirming district court's denial of defendant's motion for judgment as a matter of law); *Carter v. City of Miami*, 870 F.2d 578, 583–84 (11th Cir. 1989) (affirming district court's denial of defendant's motion for a directed verdict). But absent additional indicia of discrimination, the Eleventh Circuit has held that a two-year difference is not enough to establish a prima facie case. *See Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1390 (11th Cir. 1983). The Eleventh Circuit has also held in an unpublished opinion that a six-year age difference, without additional evidence of discrimination, is not

sufficient to show that the defendant selected a "substantially younger" person for purposes of the prima facie case. *Suarez v. Sch. Bd. of Hillsborough Cnty.*, 638 F. App'x 897, 901 n.1 (11th Cir. 2016).

DSG hired Allen, who is two years younger than Gissendaner, to be store manager in Panama City after interviewing both candidates and evaluating both applicants' performance as DSG store managers.   Without more evidence to indicate age discrimination, the two-year difference is not significant enough to satisfy Gissendaner's burden to establish a prima facie case. *See Pace*, 701 F.2d at 1390; *Marquez v. Costco Wholesale Corp.*, 550 F. Supp. 3d 1256, 1277 (S.D. Fla. 2021).   Because Gissendaner cannot make out a prima facie case, his age discrimination claim for the denial of his transfer to Panama City fails.

### ii.    Legitimate, Nondiscriminatory Reasons

Despite Gissendaner's inability to establish a prima facie case, DSG still offers legitimate, nondiscriminatory reasons for selecting Allen for the store manager position in Panama City over Gissendaner.   "[A]n employer may [select a different candidate for a position] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (citation omitted).   For example, an employer's decision to hire one candidate over another because of "superior qualifications" and more "first-hand experience" are legitimate, nondiscriminatory reasons. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Additionally, an employer can use subjective reasons, including interview performance, as

legitimate, nondiscriminatory reasons for selecting one candidate over another. *Chapman v. AI Transport*, 229 F.3d 1012, 1034–36 (11th Cir. 2000) (en banc).

That is what DSG did here.  After careful review of the applications of both Allen and Gissendaner, DSG selected Allen for the store manager position in Panama City.  DSG offers the following reasons for its choice:  Allen interviewed better than Gissendaner; Allen had more experience in complex stores; Allen had higher potential scores; Allen demonstrated a greater knowledge of the Panama City market; Allen presented a genuine interest in the market; and the interview team believed that Gissendaner was only interested in the position as a steppingstone to district leadership.  The proffered reasons align with those previously recognized by the Eleventh Circuit as legitimate in both *Brooks* and *Chapman*. *See Brooks*, 446 F.3d at 1163; *Chapman*, 229 F.3d at 1034–36.  Indeed, DSG offered legitimate reasons that had no relation to Gissendaner's age for its decision to hire Allen as the store manager in Panama City.  Consequently, DSG has satisfied its burden to proffer a legitimate, nondiscriminatory reason for its decision.

### iii.    Pretext

Gissendaner does not even attempt to rebut the reasons proffered by DSG for its decision to hire Allen over him.  For each legitimate reason offered by the defendant, "the plaintiff must meet the reason proffered head on and rebut it.  If the [defendant] proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007).  "[A] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'"

*Hornsby-Culpepper*, 906 F.3d at 1312 (alteration in original) (citation omitted). In this inquiry, the Court's "sole concern is whether unlawful animus motivate[d] a challenged employment decision." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)). The Court is "not interested in whether the conclusion is a correct one" and does not "allow [ADEA] plaintiffs simply to litigate whether they [were], in fact, good employees." *Id.* Simply, the Court does "not sit as 'a super-personnel department,' and it is not [its] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman*, 229 F.3d at 1030).

Because Gissendaner fails to rebut any of the reasons offered by DSG, he fails to show that the legitimate, nondiscriminatory reasons were pretextual, and his claim for the denial of his transfer to Panama City does not survive DSG's motion for summary judgment for this additional, independent reason.

### b.     Lake Charles and Mobile

Like Gissendaner's claim regarding the denial of his transfer to Panama City, Gissendaner similarly fails to establish a prima facie case of age discrimination for both his applications to Lake Charles and Mobile.[19] Again, even if Gissendaner had carried his

---

[19] Additionally, for Gissendaner's claim regarding Mobile, he did not even officially apply for the position but merely mentioned in an email that he would like to be considered for the store manager position.

initial burden, the Court finds that DSG offers legitimate, nondiscriminatory reasons for denying the transfer, which Gissendaner fails to rebut.

### i.      Prima Facie Case

While Gissendaner meets the first prong of his prima facie case, he fails to carry his burden that the denial of his transfer to Lake Charles or Mobile qualifies as an adverse employment action.

Unlike the Court's analysis for his transfer to Panama City, the evidence presented does not sufficiently support a finding that the denials of Gissendaner's requested transfers to Lake Charles and Mobile were adverse employment actions.   To meet his burden, Gissendaner must show that "a reasonable person . . . would prefer being transferred [to the new] position." *Jefferson*, 891 F.3d at 921 (alteration in original) (quotation and citation omitted).   Gissendaner claims that "[i]t is almost certain that [Gissendaner], who was far more experienced than the two young candidates, would have received a higher salary than the two applicants were offered and more than he was making at the Dothan store." (Doc. 54 at 32).   Gissendaner cites nothing in the record to support this proposition. Gissendaner further argues that Mobile and Lake Charles are higher volume stores than Dothan but again fails to provide evidentiary support.   Gissendaner cites to his own deposition to show Lake Charles and Mobile are higher volume stores, but the portion of Gissendaner's deposition which he cites does not reference either store.   It merely states Gissendaner's understanding that he needed to manage a higher volume store to move into district leadership. (*See* doc. 54 at 32 (citing doc. 53-9 at 16)).   On the other side, DSG provides the declaration of Monica Rowden ("Rowden"), a DSG executive who reviewed

personnel records of the candidates selected for the Lake Charles and Mobile positions. She stated that both managers' salaries "w[ere] significantly lower than what Mr. Gissendaner was already making." (Doc. 47-5 at 2, para. 11).

Gissendaner has the burden of establishing a prima facie case of age discrimination. He fails to do so here.  Simply, Gissendaner fails to offer any evidence that shows "a reasonable person faced with a choice [between the positions] . . . would prefer being transferred to [the new] position." *Jefferson*, 891 F.3d at 921 (alteration in original) (quotation and citation omitted).  The record evidence identified by the parties suggests that the Lake Charles and Mobile positions offered a *lower* salary and the same responsibilities.  A decision not to transfer an employee to a different position under these circumstances is not an adverse action. *See Barnhart*, 206 F. App'x at 893.  Because Gissendaner fails to show that the denial of his transfer to Lake Charles or Mobile qualifies as an adverse employment action, he cannot make a prima facie case of age discrimination.

## ii.    Legitimate, Nondiscriminatory Reasons

Even if Gissendaner had shown a prima facie case, the Court finds that DSG offers legitimate, nondiscriminatory reasons for denying Gissendaner's requests to transfer to Lake Charles and Mobile.

After Gissendaner did not receive the position in Panama City, he expressed his frustrations to Mosby about his strained relationship with Jordan and the lack of investigation into the Topgolf incident in 2019.  In response, Mosby launched a formal investigation and substantiated the allegation that Gissendaner made a racially insensitive comment.  Mosby determined that Gissendaner violated DSG leadership policy and should

not be considered for any other positions, disqualifying him from the open positions in Lake Charles and Mobile.  "[DSG]'s honest belief that an employee violated its policies can constitute a legitimate reason for [denying a transfer] even if the employer's belief may have been mistaken or wrong." *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x. 825, 829 (11th Cir. 2019) (citing *Smith v. PAPP Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987)).  Here, DSG has shown that, after investigating, Mosby held an honest belief that Gissendaner violated DSG policy by making a racially insensitive comment, and this violation of DSG policy—not age—motivated Mosby's decision.  DSG has thus carried its burden and offered a legitimate reason for its decisions not to transfer Gissendaner.

### iii.    Pretext

Even if Gissendaner established a prima facie case, he still needs to rebut the proffered reasons and show that "unlawful discriminatory animus motivated [DSG's] decision" to survive summary judgment. *See Alvarez*, 610 F.3d at 1266.  Any arguments that "merely dispute the wisdom of [DSG's] reasoning . . . [are] insufficient to establish pretext." *Hornsby-Culpepper*, 906 F.3d at 1313.  Gissendaner's arguments only do that. He simply quibbles with DSG's companywide politics during 2020 (and beyond) and questions the reasoning behind its decision to select other candidates for the store manager positions in Lake Charles and Mobile.  That is not enough.

Gissendaner fails to specifically rebut the determination made by Mosby that he needed to improve upon certain leadership qualities before he could transfer locations. Instead, Gissendaner claims that he is a victim of discrimination due not just to his age but also because of DSG's branding of him as a racist.  "Of note," according to Gissendaner,

"in between the [Topgolf] encounter and Mosby's learning of it, the George Floyd killing [occurred,] and the Black Lives Matter movement started. On June 2, 2020, DSG actually changed its profile picture on Twitter to a black screen to protest racism and police brutality . . . ." (Doc. 54 at 37). Gissendaner's claims that these events support the proposition that DSG's proffered reasons for not selecting him are pretext for *age* discrimination are strained to say the least. Simply, Gissendaner's argument that DSG engaged in a progressive campaign based on social events does not respond to the reasons offered by DSG, and he offers no credible evidence to place DSG's legitimate, nondiscriminatory reasons for denying his transfers in doubt.

Soon after Jordan told Gissendaner that he had not been selected as the store manager in Panama City, Gissendaner reached out to Mosby to express his grievances about Jordan's behavior towards him. Gissendaner complained to Mosby that the Topgolf incident in 2019 had not been properly investigated, hypothesized a list of reasons why Jordan could be mistreating him, and sought relief from Mosby. To alleviate Gissendaner's concerns surrounding the Topgolf event, Mosby launched a more formal investigation. Mosby directed Johnson to interview employees she identified that could have additional information. Mosby received confirmation from multiple sources that Gissendaner made a racially insensitive comment towards a fellow store manager. Upon reviewing the evidence, Mosby found the comment startling and unbecoming of a DSG store manager. She stated that if she were the HR manager in 2019, she would have recommended that DSG terminate Gissendaner's employment immediately. But Gissendaner was not terminated at this time. Instead, Mosby recommended that Gissendaner construct an IDP

with Jordan to improve his ability to foster a more inclusive environment. Upon completion of his IDP, Mosby noted that Gissendaner could advance within DSG.

Mosby completed her investigation prior to DSG's decision to name a store manager in Lake Charles and in Mobile. Based on the findings of her investigation, Mosby recommended that Gissendaner not be eligible for a transfer until he made several changes to his own leadership practices at his current location. Mosby claimed that Gissendaner's behavior made him "unqualified" to be transferred to another store. The reasons proffered by Mosby had no relation to Gissendaner's age but only dealt with his conduct. Specifically, he failed to meet the standards of professionalism and inclusivity that DSG expects of its store managers. DSG reached its conclusion after an investigation— undertaken upon Gissendaner's request—which Gissendaner now fails to show was pretextual.

Gissendaner further argues that the proffered reasons were pretextual because DSG claimed that he was "unqualified" for the roles in Lake Charles and Mobile despite Gissendaner's experience as a store manager in Dothan and internal talent ratings. (Doc. 54 at 31, 37). But Gissendaner's argument fails to account for the fact that "[p]ersonal qualities . . . factor heavily into employment decisions concerning supervisory or professional positions. Traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion, yet they are essential to an individual's success in a supervisory or professional position." *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting

*Denney v. City of Albany*, 247 F.3d 1172, 1186 (11th Cir. 2001)).[20]  DSG acted in such a fashion here as it found Gissendaner failed to meet its standards for leadership qualities separate from financial performance.  The evidence presented does not suggest that DSG had the same concerns about the leadership qualities of the candidates selected in Lake Charles and Mobile as neither one had been "investigated for or accused of making racially insensitive comments." (Doc. 47-5 at 2, para. 13).  Consideration of subjective qualities like "leadership ability and maturity"—and deeming Gissendaner unqualified because of DSG's evaluation of his leadership qualities— "does not raise a red flag" that suggests discriminatory animus based on age or support Gissendaner's pretext argument. *Denney*, 247 F.3d at 1186.

### c.  Termination

Gissendaner's final claim related to age discrimination is his ultimate termination from DSG.  Again, Gissendaner fails to make out a prima facie case, and even if he did, DSG offers legitimate, nondiscriminatory reasons for terminating Gissendaner, which he fails to rebut.

---

[20] Even though DSG relied on the findings of Mosby's investigations as at least one of the reasons for selecting other candidates in Lake Charles and Mobile, Gissendaner's argument that his qualifications are so superior that the only explanation for DSG not hiring him is age discrimination also fails. "[A] plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer*, 509 F.3d at 1349.  Rather, the disparities must be "so apparent as virtually to jump off the page and slap you in the face" to support a finding of pretext. *Denney*, 247 F.3d at 1187 (citation omitted).  The differences between Gissendaner's experience and talent scores and the selected candidates' experience and talent scores are insufficient to establish pretext. (*See supra* Section IV.D. (noting talent scores)); *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771–73 (11th Cir. 2005) (noting that publications in the relevant field and additional education was one factor that supported the plaintiff's pretext argument).

### i.    Prima Facie Case

It is undisputed that Gissendaner can establish the first two prongs of a prima facie case, as he is above the age of forty and was terminated from his employment.  Termination is an adverse employment action.  *See Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) ("Adverse employment actions include 'tangible employment actions,' which are those actions 'that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.'" (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020)).  DSG does not dispute that his termination meets the second prong of a prima facie case of age discrimination.  Gissendaner, however, fails to establish the third prong—that he was replaced by a substantially younger person. *See McCreight*, 117 F.4th at 1334 ("A plaintiff proceeding under [the *McDonnell Douglas*] framework bears an initial burden of establishing a prima facie case of discrimination." (citation omitted)).  Indeed, he fails to present evidence showing the age of the individual who replaced him as store manager in Dothan.  Without evidence to support the proposition that the person who replaced him is significantly younger, Gissendaner cannot carry his burden to establish a prima facie case of age discrimination. *See* Fed. R. Civ. P. 56(e); *cf. Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1083 (11th Cir. 1990) ("That [the plaintiffs] were in a protected age group and were adversely affected by an employment decision is uncontested.  But that is not enough to raise a prima facie case.").

### ii.     Legitimate, Nondiscriminatory Reasons

While Gissendaner fails to carry his burden to establish a prima facie case and shift the burden to DSG, DSG still offers legitimate, nondiscriminatory reasons for ultimately deciding to terminate Gissendaner's employment.  Again, the Court's "sole concern is whether unlawful animus motivate[d] a challenged employment decision." *Rojas*, 285 F.3d at 1342 (quoting *Damon*, 196 F.3d at 1361).  The Court's role is not to question the wisdom of DSG's decision.

DSG proffers legitimate, nondiscriminatory reasons for terminating Gissendaner; namely, his unprofessional conduct on multiple occasions.  The reports of misconduct from Employee 1 and Watford, along with the Topgolf incident, informed DSG's decision to terminate Gissendaner.  DSG's proffered reasons for terminating Gissendaner qualify as legitimate and nondiscriminatory. *See, e.g.*, *Taylor v. Henry Cnty.*, 2006 WL 8432767, at *7 (N.D. Ga. Aug. 14, 2006) (finding complaints from subordinates about management style and racially insensitive comments supported defendant's legitimate, nondiscriminatory reasons for termination).

### iii.     Pretext

Because DSG proffered legitimate, nondiscriminatory reasons for its termination decision, the burden shifts back to Gissendaner to rebut DSG's proffered reasons and show that "unlawful discriminatory animus motivated [DSG's] decision." *See Alvarez*, 610 F.3d at 1266.  Throughout his brief in opposition to summary judgment, Gissendaner disagrees with the manner of DSG's investigation of the Topgolf incident and argues that DSG did not diligently investigate the incident.  That argument is not persuasive.  When a court

"assess[es] whether an employer has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether the employer in good faith believed that the employee had done so." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1148 (11th Cir. 2020) (en banc). "The inquiry of the ADEA is limited to whether [DSG] *believed* [Gissendaner] was guilty of [unprofessional behavior], and if so, whether this belief was the reason behind [his] discharge." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (emphasis original). While DSG may not have investigated Gissendaner's complaints in the exact manner that Gissendaner desired, DSG did speak with several witnesses to reach its conclusion that Gissendaner made the racially insensitive comment alleged. There is no evidence presented in the record that DSG's conclusion was reached in bad faith.

As already noted, Gissendaner cannot merely dispute the wisdom of DSG's business practices and decisions to survive summary judgment. *Hornsby-Culpepper*, 906 F.3d at 1313. Instead, Gissendaner must show that it was discriminatory intent that motivated DSG's decision to terminate Gissendaner's employment. As with each of the other adverse employment actions that Gissendaner alleges, he fails to show that the reasons proffered by DSG are illegitimate and pretextual.

## 2.      Convincing Mosaic[21]

Even though Gissendaner failed to establish discrimination through the *McDonnell Douglas* framework, he can still carry his burden and survive summary judgment under a convincing mosaic theory.   Although Gissendaner does not make a convincing mosaic argument, it is ultimately the district court's "task to consider whether [a plaintiff] ha[s] put enough evidence in the record to convince a jury that [he] faced age discrimination." *McCreight*, 117 F.4th at 1338.  "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred; (2) 'systematically better treatment of similarly situated employees'; and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis II*, 934 F.3d at 1185). Upon review of all the evidence in this case, Gissendaner fails to construct a mosaic of circumstantial evidence sufficient to allow a reasonable jury to infer that discrimination was the true reason for the denial of his transfers and termination.

At bottom, Gissendaner's mosaic consists primarily of four tiles:   his high performance reviews; statements from Jordan that he was a dinosaur; the age of the store

---

[21] In *Bailey v. Knology of the the Valley, Inc.*, another judge in this district declined to apply the convincing mosaic analysis to the plaintiff's AADEA claim and only applied it to the plaintiff's ADEA claim. 2023 WL 3295456, at *4 n.3 (M.D. Ala. May 5, 2023).  While that court correctly noted that no "Alabama courts have applied the convincing mosaic analysis to AADEA claims," the Court here includes the AADEA claim as part of its convincing mosaic analysis as the Eleventh Circuit has noted that *McDonnell Douglas* and the convincing mosaic are really two routes to arrive to the same place—the summary judgment standard. *See Tynes*, 88 F.4th at 943–47.  The Supreme Court of Alabama's agreement with federal courts that "ADEA principles should therefore govern in AADEA cases" applies equally to the convincing mosaic analysis even though that labelling convention was not before the Supreme Court of Alabama in *Robinson*. 964 So. 2d at 1228.  Neither party has argued that the convincing mosaic analysis should or should not apply to the AADEA claim.  The Court's decision to include the AADEA claim in the convincing mosaic analysis has no effect on the ultimate outcome.

managers ultimately selected in Lake Charles and Mobile; and claims that DSG's renewed commitment to social equality in light of the events of 2020 created animosity towards him, a forty-two-year-old white male. Together, this evidence fails to paint a picture from which a reasonable jury could infer age discrimination. Of these four tiles, the Court previously addressed three as part of the analysis under *McDonnell Douglas* and need only elaborate on the dinosaur comments attributed to Jordan.[22] While comments like Jordan's could support a finding of age discrimination, these specific comments do not on the record presented. As the First Circuit noted, "the standard usage of the term 'dinosaur' does not convey an age-related message" and "means 'impractically large, out-of-date, or obsolete.'" *Torrech-Hernandez*, 519 F.3d at 55 (quoting *Merriam-Webster*'s Collegiate Dictionary 326 (10th ed. 2002)). Here, assuming Jordan made the comments, the context surrounding the comments contradicts Gissendaner's assertion that they show a discriminatory animus based on age because Jordan began making the comments shortly after the TopGolf incident involving Gissendaner's use of racially insensitive language. (*See* doc. 53-9 at 15). Even Gissendaner noted that he "believe[d] [the dinosaur comments were] a representation that he wanted me to be more progressive." (Doc. 47-1 at 10). In reaching this conclusion, the Court does not suggest that the comments of a decisionmaker could never be enough to support a discrimination claim proceeding past summary judgment, but, in light of the entire mosaic presented by Gissendaner, Jordan's comments are not sufficient for a reasonable jury to find age discrimination. *See Tidwell v. Carter*

---

[22] Jordan denies that he ever referred to Gissendaner as a "dinosaur." (Doc. 47-7 at 8, para. 22).

*Prods.*, 135 F.3d 1422, 1427 (11th Cir. 1998) (holding a "stray remark" was insufficient to cast doubt on the legitimate reasons proffered by the defendant for termination).

## C.    Retaliation[23]

Finally, Gissendaner claims DSG retaliated against him for meeting with HR to express his concerns about age discrimination and filing a complaint with the EEOC.  The familiar *McDonnell Douglas* burden-shifting framework applies to Gissendaner's retaliation claims.[24]  Gissendaner must first make a prima facie case.  "[T]o successfully allege a prima facie retaliation claim . . . under . . . the ADEA . . ., a plaintiff must show that (1) []he engaged in statutorily protected expression; (2) []he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Weeks*, 291 F.3d at 1311 (citations omitted).  The burden then shifts to DSG to articulate a legitimate, non-retaliatory reason for the adverse employment action, and Gissendaner must rebut each proffered reason to survive summary judgment. *See Stone v. Geico Gen. Ins. Co.*, 279 F. App'x 821, 822 (11th Cir. 2008) (citation omitted).  Even if

---

[23] While a plaintiff "may prove . . . a claim of retaliation[] with circumstantial evidence" under a convincing mosaic theory, Gissendaner does not make the argument, and the Court independently finds that he does not produce sufficient evidence to allow a "reasonable inference of retaliatory intent" for the same reasons articulated in this Section and Section V.B.2. *Berry*, 84 F.4th at 1310.

[24] Gissendaner argues that he "presented direct evidence of retaliation," but the only "evidence" he presents in this section of his brief is a series of case citations and argument that DSG failed to adequately investigate the Topgolf incident in 2019. (Doc. 54 at 46–48).  Simply, he does not point to any evidence that "demonstrates unambiguously that" DSG's decisions not to transfer him and to terminate him were motivated by a retaliatory animus. *Harrison v. Macy's Inc.*, 2023 WL 6140827, at *5 (11th Cir. Sept. 20, 2023) (citing *Jefferson*, 891 F.3d at 922); *see also Osmann v. Meredith Corp.*, 82 F.4th 1007, 1015 (11th Cir. 2023) ("Direct evidence of discrimination is evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee, and, if believed, proves the existence of a fact *without inference or presumption*." (citation omitted) (emphasis original)).  Because Gissendaner does not provide direct evidence, the Court uses the *McDonnell Douglas* burden-shifting framework to analyze his retaliation claims.

Gissendaner could establish a prima facie case, DSG offers legitimate, non-retaliatory reasons for taking each adverse action against Gissendaner, [25] which he failed to show were pretextual.  DSG, therefore, is entitled to summary judgment in its favor on Gissendaner's retaliation claims.

In his brief in opposition to summary judgment, Gissendaner fails to demonstrate a prima facie case of retaliation.  First, he neglects to identify which of his communications qualify as statutorily protected expression but simply asserts that "[t]here is no dispute [he] engaged in protected activity when he filed multiple EEOC Charges and made internal complaints of discrimination." (Doc. 54 at 49).  DSG, however, identifies three potential instances of statutorily protected conduct in its brief and argues that none of them qualify as protected conduct:  (1) a phone call between Gissendaner and Johnson in 2020; (2) communications between Gissendaner and Mosby from December 2021 to January 2022; and (3) Gissendaner's complaint with the EEOC after he was terminated in 2022.  Of these three instances, the Court quickly discards two.  Gissendaner, in his 2020 phone

---

[25] While each transfer request did not qualify as an adverse employment action for his discrimination claims, "an 'adverse employment action' in the retaliation context does not carry the restrictive definition that it does in the discrimination setting." *Barnett v. Athens Reg'l Med. Ctr.*, 550 F. App'x 711, 714 (11th Cir. 2013).  The test for an adverse employment action for a prima facie case of retaliation is "whether 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. V. White*, 548 U.S. 53, 68 (2006)).  The record presented shows Gissendaner sought a transfer from Dothan to stores that he perceived as carrying more prestige than his current location.  In this context, the denial of each transfer, which Gissendaner actively sought and desired, "might have dissuaded a reasonable worker from making . . . a charge of discrimination," meaning they qualify as adverse employment actions. *See Burlington*, 548 U.S. at 68; *see also Taylor v. Roche*, 196 F. App'x 799, 803 (11th Cir. 2006) (holding the supervisor's refusal to transfer plaintiff to the night shift, which was more desirable to the plaintiff, was an adverse employment action for establishing a prima facie case of retaliation).  As it does in the discrimination context, termination qualifies as an adverse employment action for retaliation. *See Marria v. C.R. England, Inc.*, 679 F. App'x 844, 849 (11th Cir. 2017).  Despite meeting the second prong of a prima facie case, the Court still finds that Gissendaner fails to establish a prima facie case of retaliation.

call with Johnson, does not mention age, much less age discrimination, so it does not qualify as statutorily protected conduct. *See Jeronimus v. Polk Cnty. Opportunity Council, Inc.*, 145 F. App'x 319, 326 (11th Cir. 2005) (per curiam) (holding simple complaints of "being 'singled out,' being 'subjected to a 'campaign of harassment,' and working in a 'hostile environment'" does "not amount to protected conduct"). Next, Gissendaner filed the EEOC complaint after DSG terminated him, so it is not relevant to his retaliation claims.[26] *See Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

Only Gissendaner's communications with Mosby remain a possible source of statutorily protected expression for his prima facie retaliation case. A plaintiff can establish that his informal complaints qualify as statutorily protected expression if he "explicitly or implicitly communicate[s] a belief that the [employment] practice constitutes unlawful employment discrimination." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). But the plaintiff also "must show that []he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks*, 291 F.3d at 1311 (internal citation and quotation omitted). The plaintiff's burden has a subjective and an objective component as "the plaintiff must not only show that []he subjectively (i.e.,

---

[26] Gissendaner claims that his communications with the EEOC began in January 2022, but he did not file his formal complaint until June—four months after he was fired in March. DSG's decisions not to transfer Gissendaner and ultimately terminate him, therefore, could not be retaliation for a protected expression that had not yet occurred. *See Pipkins*, 267 F.3d at 1201 (affirming dismissal of retaliation claims based on protected activity that occurred after termination). Gissendaner claims that DSG knew of Gissendaner's conversations with the EEOC, relying on Employee 1's deposition testimony. In that deposition, Employee 1 mentions that, at some point in the month of February, he told Rowden that Gissendaner confided in him about complaints Gissendaner had made but does not explicitly state he informed Rowden of Gissendaner's conversations with the EEOC. (*See* doc. 53-12 at 6). Further, the record does not show that Rowden had any role in Gissendaner's termination or denial of requested transfers from Dothan.

in good faith) believed the defendant was engaged in unlawful employment practices, but also that [his] belief was *objectively* reasonable in light of the facts and record present." *Furcron*, 843 F.3d at 1311 (emphasis original) (quotations and citation omitted). Gissendaner fails to articulate how his communications with Mosby meet this standard, and it is not the Court's responsibility to formulate arguments on Gissendaner's behalf. *See Resol. Tr. Corp.*, 43 F.3d at 599. Unaided by Gissendaner, the Court declines to engage in such an exercise. With inadequate support in his brief and the record, Gissendaner does not establish that his communications with Mosby qualify as statutorily protected expression. *See Ceus v. City of Tampa*, 803 F. App'x 235, 248 (11th Cir. 2020) (citing *Coutu v. Martin Cnty. Bd. of Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) for the proposition that a "written grievance was not [a] protected activity [when the] plaintiff offered no proof of discrimination to support her conclusory allegations"). Without the first prong, Gissendaner cannot establish a prima facie case of retaliation. *See, e.g., Tatt v. Atlanta Gas Light Co.*, 138 F. App'x 145, 148 (11th Cir. 2005) ("[The plaintiff] did not engage in statutorily protected expression, a necessary element in proving a prima facie case of [ ] retaliation."). Even if Gissendaner could show that his communications with Mosby were protected expressions, he offers insufficient evidence of a causal link.

Notwithstanding Gissendaner's failure to establish a prima facie case, the Court finds that his retaliation claim fails because DSG—as the Court already found for Gissendaner's age discrimination claims—proffers legitimate, nonretaliatory reasons for denying his transfer requests and for terminating him. Gissendaner, in turn, fails to call these reasons into question. While the Court does not rehash every reason proffered by

DSG discussed above in Sections V.B.1.b.ii and V.B.1.c.ii, the Court reiterates the salient reasons underlying DSG's decisions.  Namely, DSG relied on Gissendaner's comment at Topgolf, his inability to move past the Topgolf incident, Employee 1's relationship with Gissendaner, and the Popeye's comment.  Gissendaner fails to satisfactorily rebut any of these reasons and show they are pretext for retaliation.  Because DSG presented legitimate, non-retaliatory reasons for denying Gissendaner's transfers and ultimately terminating him, which he failed to rebut, summary judgment is appropriate in DSG's favor.

## VI.  CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1.     DSG's motion for summary judgment (doc. 46) is GRANTED;

2.     Gissendaner's motion to strike Employee 1's affidavit (doc. 55) is DENIED; and

3.     Gissendaner's motion to strike Stanley Mays' affidavit (doc. 56) is DENIED as moot.

A separate Final Judgment will enter.

Done this 17th day of January, 2025.

           /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE